PRESTON *v.* GRAND RAPIDS SAVINGS BANK.

1. BILLS AND NOTES—FRAUD—FINDING OF COURT BELOW NOT CON-
   CLUSIVE.
   In a suit for the cancellation of a certain note on the
   ground that plaintiff's indorsement thereof was obtained
   by fraud, the finding of the court below that said charge
   had not been established, while not conclusive upon the
   appellate court, is entitled to great weight.[1]

2. SAME—FRAUD NOT ESTABLISHED.
   Plaintiff's claim of conspiracy to defraud, *held*, not estab-
   lished by a preponderance of the proof submitted.[2]

3. SAME—ACCOUNTING—AGREEMENT FOR COLLATERAL NOT ESTAB-
   LISHED.
   Plaintiff's claim that it was agreed that he was to receive
   certain collateral which has not been turned over to him,
   *held*, not established by a preponderance of the proofs.[3]

Appeal from Kent; Dunham (Major L.), J. Sub-
mitted April 7, 1925. (Docket No. 1.) Decided
October 1, 1925.

Bill by Thad B. Preston against the Grand Rapids
Savings Bank, the Michigan Guaranty Corporation,
Adolph H. Brandt, and Allen G. Thurman for the can-
cellation of a note, and for an accounting. From the
decree rendered, plaintiff appeals. Affirmed.

*Eldred & Gemuend,* for plaintiff.

*Butterfield, Keeney & Amberg,* for defendant Grand
Rapids Savings Bank.

*Norris, McPherson, Harrington & Waer,* for defend-
ant Michigan Guaranty Corporation.

SHARPE, J. In 1920, and for several years prior

[1]Appeal and Error, 4 C. J. § 2650; [2]Bills and Notes, 8 C. J.
§ 1361; [3]Id., 8 C. J. § 1359.

thereto, Allen G. Thurman & Company, a corporation of which Mr. Thurman owned nearly all the stock, was engaged in the business of stock brokers at the city of Grand Rapids.  It did its banking at the defendant bank.  It had a general line of credit, and on December 13, 1920, owed the bank about $89,000, secured by collateral.  The company also had a checking account at the bank.  It had branch offices at Flint, Saginaw, and other cities.  In December, 1920, Bank Examiner O'Brien, while examining a bank in Flint, became suspicious that the company was engaged in drawing checks or drafts upon their branch offices and depositing them to meet demands in the defendant bank.  This practice is called "kiting" by bankers.  A visit to the defendant bank on December 13th confirmed his suspicions.  He notified the bank, and it stopped payment on the checks and drafts outstanding, and refused to accept others, except for collection in the usual course.  The total amount of drafts and checks then in transit, and for which the company had obtained credit on deposit in the bank, was about $270,000.  Of this amount, it afterwards developed that about $191,000 was fictitious, and the result of the kiting process.  Thurman, on being summoned to the bank, admitted the fraudulent transactions, but stated that the amount thereof was much less than claimed by the examiner.  The examiner demanded that cash be placed in the bank to take up the kited paper.  Thurman wanted time, saying that he could obtain financial help from friends, naming, among others, the plaintiff.  December 20th was fixed as the limit of time within which the fictitious paper must be retired.

The defendant Brandt was a vice-president of the bank, and a personal friend of Thurman.  Most of the deposits of checks and drafts made by the company had been approved by him.  He felt, in a

measure at least, responsible for the condition the bank was in.    On December 13th, he turned over to Thurman $10,000 worth of the stock of the Michigan Guaranty Corporation and a certificate of deposit for about the same amount.    At a meeting of the board of directors on the 14th, Mr. Brandt asked to be relieved of his duties at the bank in order that he might assist Thurman in straightening out the matter, and this was assented to.    Ex-Senator Smith, the president, thereafter took entire charge of the matter on behalf of the bank.

On the evening of the 13th, Thurman went to Ionia and met the plaintiff.    They had been long acquainted. Plaintiff had for years been a customer of the company, and was a man of large means.    He had theretofore been interested with Thurman in financial deals.    Thurman at that time informed plaintiff that he was in financial difficulty.    He testified that he told him about his kiting practices.    This, plaintiff denied.    Thurman told plaintiff that Brandt was helping him.    Plaintiff then agreed to loan Thurman $30,000 par value of Haskelite preferred stock and $20,000 par value of Exhibitor's Mutual Distributing Corporation stock, upon the understanding that Brandt would sign an agreement with Thurman to return the stock in 60 days.    The agreement was signed and the stock delivered the following day.    The bank refused to accept this stock in part liquidation of Thurman's debt to it, and Thurman and Brandt took it to Chicago, where they obtained $10,000 by pledging the Haskelite stock.    This was turned in to the bank and applied in retirement of one of the company's checks.

While Thurman and Brandt differ as to who suggested the trip, they went to see the plaintiff on the following day.    Plaintiff was informed of their inability to use all of the stock he had turned over to

Thurman.　A note was then drawn up by plaintiff for $60,000, payable to the order of Brandt and plaintiff, due in 90 days, signed by Thurman & Company, and indorsed by Thurman, Brandt and plaintiff.　It is plaintiff's claim that they represented to him that, if he would indorse this note, it would be handled by the defendant guaranty corporation, of which the same men were in financial control as in the defendant bank; that the bank held $66,000 of Thurman & Company's collateral, which it would thereafter hold to protect the note, and that the $60,000 would pay all of the company's indebtedness to the bank.　President Smith refused to accept the note, saying the bank must have the money.　This note was destroyed at Thurman's suggestion, and another executed by him individually and indorsed in similar manner was substituted for it.　It was afterwards turned over to the defendant guaranty corporation and the proceeds received by the bank and credited to the company's account.

On the 17th, plaintiff went to the defendant guaranty corporation, and on deposit of certain securities with it obtained a personal loan of $80,000, due in one year.

On the evening of the 17th, plaintiff claims that Thurman informed him by telephone that $42,000 additional had to be paid by him or he would be put in jail.　The next morning, plaintiff went to see President Smith and, after conference (there being much conflict as to what was said thereat), plaintiff executed a note for $42,000 and deposited certain collateral therewith.　It is his claim that it was then agreed that he should receive as collateral from the bank $18,200 of stocks or bonds the Thurman company had at its Saginaw office and $10,000 of stocks or bonds it held at its Flint office, which stocks and bonds had been annexed to kited drafts, and $7,000 of drafts

in transit for collection, if the same were collected. This, the bank officials deny.   They admit, however, that plaintiff was to receive any securities or moneys afterwards received in connection with the Thurman company kited checks or drafts, and they claim that these were turned over to him.

In this suit plaintiff seeks to set aside and cancel the $60,000 note, because his indorsement thereof was obtained by fraud; for an accounting as to the collateral securities which were to have been turned over to him; to have the $80,000 note declared usurious, and he be relieved of the interest charged thereon, and that certain collateral accompanying said note be released.

Relief was denied by the trial court, except as to the charge of usury.   Plaintiff, however, was required to pay the legal rate on the money actually received by him.   Counsel concede that the indebtedness on this note has been fully settled, so it will not be further considered.   From the decree entered, plaintiff appeals.

1. The $60,000 note.    There is nothing upon the face of this note to indicate that its payment was secured by collateral.   Plaintiff's counsel frankly state that his right to relief is based upon the claim—

"that William Alden Smith, Adolph H. Brandt and Gilbert Daane and Allen G. Thurman entered into and carried out a conspiracy to defraud this plaintiff, and procured such $60,000 note from him by means of and while carrying out such conspiracy."

The trial court found that this charge had not been established.   His findings and the reasons therefor are set forth at length in the opinion filed by him. While not conclusive upon us, as the hearing here is *de novo*, his findings are entitled to great weight, as he heard and saw the witnesses (except Mr. Thurman, whose deposition was taken).   It must also be borne

in mind that nearly two and one-half years elapsed between the time when the note was given and the hearing in the circuit court.    Lapse of time and the interest of the parties must always be taken into consideration in weighing the testimony of witnesses.

The plaintiff testified positively that the representations as claimed by him were made.    His counsel insist that Mr. Thurman also so testified, and that there is no positive denial on the part of Mr. Brandt. At that time, the bank held certain securities of the Thurman company as collateral to the line of credit it had extended to the company.    It also had under its control certain securities which had been attached to the forwarded checks and drafts, for which it had given the company credit in its checking account, the amount or value of which had not then been determined.    There is no direct proof that Brandt had authority to pledge the securities first above referred to for the payment of this note.    There is nothing in the record to justify a presumption that he had such authority, unless it be the desire of the officials of the bank to secure plaintiff's indorsement on this note.    If, to do so, the bank agreed to release securities it then held as collateral to a *bona fide* indebtedness of the Thurman company to it, it is difficult to see how it would in any way profit by the transaction.    While Brandt admits that there was talk about collateral, he testified: "I said, a lot of these drafts that are out have collateral attached to them." A careful reading of his entire testimony satisfies us that there was no admission by him that the securities collateral to Thurman & Company's general line of credit in the bank were to be treated as collateral to this note.    While frankly admitting that he did not recall all that was said, we are impressed that his testimony is in direct conflict with that of plaintiff as to the representations claimed to have been made

by him.    Mr. Thurman in his deposition testifies that "an indefinite threat" had been made to him by President Smith that he must produce $60,000 or they "would close me up," and "I said I would go and get it;" that at Ionia Brandt "proposed to Mr. Preston that they, Mr. Brandt and Mr. Preston, indorse my note, or sign a note with me for $60,000.    If Mr. Preston would do this, he, Mr. Brandt, would work my collateral around in such manner that there would be $66,000 of it against the note."    He admitted that, when examined as a witness in the bankruptcy proceedings thereafter taken, he had said as to what then occurred:

"Mr. Brandt, to the best of my recollection, told Mr. Preston that he thought my affairs would wash out over there at the bank so there would be $60,000 or $65,000 worth of collateral against that $60,000 note. He didn't make it in the form of a positive statement, but he said he thought there would be."

He admitted that this collateral could only be obtained by "taking it off from some other loan."

It is apparent that the testimony of Mr. Thurman, taken as a whole, would not in itself be sufficient to support the charge of fraud here relied on.    It therefore has little weight as corroborative of the positive testimony of the plaintiff.

Where witnesses, apparently men of integrity, differ, a court can but weigh the probabilities as to who is mistaken.    The plaintiff was president of a bank at Ionia, and familiar with business affairs.    His experience could but render him cautious in accepting a parol promise, on which the payment of so large a sum was dependent, when it could easily have been reduced to writing.    Two days before, when he turned over certain stocks to Thurman to help him out of his difficulty, he had his attorney prepare a written undertaking that they would be returned to

him, and insisted that it should be signed, not only by Mr. Thurman but also by Mr. Brandt.   The improbability that he would obligate himself to pay so large a sum without security is met by the claim that, if the promise as testified to by him was made by Brandt, he would certainly have required that it be reduced to writing.   He does not testify that there was any talk about doing so.

The $60,000 note, as before stated, was signed by Thurman & Company.   After President Smith had refused to accept it and insisted that the indebtedness must be paid in money, it occurred to Mr. Thurman that the making of so large a note by the company might prejudice its financial standing, and he then requested that a note, made by him personally and indorsed as was the other, be substituted for it, and this was done.   This note, while bearing the same date as the other, was not signed by plaintiff until after the $42,000 note was given by him.   This circumstance is somewhat important.   When the $42,000 note was given, the question of collaterals possessed by Thurman & Company, and which plaintiff was to receive when returned to the bank, was discussed.   (This is more particularly hereafter referred to.)   There was nothing then said about other collateral which the bank held, and which plaintiff claims Brandt promised him should secure the $60,000 note.   Had this promise been made, it would seem but natural that plaintiff at that time would have sought some information as to the collateral securing the $60,000 note.

That the memory of witnesses as to conversations had several years before is treacherous, and may not always be relied on, is indicated in the positive statement of plaintiff, when examined as a witness in the bankruptcy proceeding, that Mr. Brandt at Ionia said to him:

"It is a very, very serious thing because there had been two bank scandals in Grand Rapids, the French defalcation and the Ellis death, in which he owed over four million dollars, and he asked me if I would indorse a note for $60,000," etc.,

when in fact the death of Mr. Ellis did not occur until some time thereafter. We have no doubt that Mr. Brandt made statements about collateral which might be held to secure this note, but we are impressed that they referred to collateral attached to or security for some of the items with which the company had been credited in its checking account and such as were deposited by the company to secure its general line of credit and would not be needed therefor. Some of the latter were afterwards turned over to plaintiff. The claim that Brandt and Thurman represented that "what Thurman then needed to square himself with the bank was $60,000 in cash" is without force, because, at the time plaintiff signed the substitute note, he knew that $42,000 additional was needed to do so, and he had at that time given his note to cover such shortage.

After a careful consideration of the entire record, we cannot find that the claim of conspiracy to defraud is established by a preponderance of the proof submitted.

2. The $42,000 note. On the afternoon of December 17th, Thurman was informed that the balance of his indebtedness, after applying the proceeds of the $60,000 note, not including his general line of credit, was $42,000, and that it must be paid. Plaintiff, on being so informed by Thurman by telephone, came to Grand Rapids the next morning. A conference was held in the bank, at which he, President Smith, and Mr. Daane, the vice-president and cashier, were present. The plaintiff then executed and delivered his note for $42,000, due in 90 days, and deposited certain collateral to secure its payment. It is plaintiff's claim that certain items in transit and others

due from the Saginaw and Flint branches were looked up, amounting in all to $35,400; that he said to Mr. Smith: "Supposing that I advanced this $42,000, do I get these items?   Do they come to me?" and was answered:   "They do; you will get them; we will order them returned and turn them over to you," and that, in consideration of such promise, he signed and delivered the note; that he made a memorandum of such items at that time.   Mr. Smith denies that he said anything to plaintiff about such collateral.   Mr. Daane testified:

"Mr. Preston was standing by the window on the Ionia St. side with his hat in his hand and said, do I get anything for this?   The senator said not that I know of.   I said, well now, senator, if this cleans the matter up—we were not sure whether it did or not—and if there is anything comes back from the Flint or Saginaw bank, I don't see why we couldn't turn that over to Mr. Preston, also there are some drafts outstanding for collection that with Mr. Thurman's consent we can turn the proceeds over to Mr. Preston on Thurman's order."

What has been said relative to the $60,000 note applies with equal force to the claim made relative to this note.   It is sufficient to say that plaintiff has failed to establish his claim by a preponderance of the proofs when considered in the light of the surrounding circumstances.   Certain of the collaterals referred to by Mr. Daane afterwards reached the bank and were turned over to plaintiff.   We cannot say under the proofs that he was entitled to any other.

In view of the conclusion reached on the facts, it is unnecessary to consider the legal questions discussed by counsel.

The decree is affirmed, with costs to appellees.

McDONALD, C. J., and CLARK, BIRD, MOORE, STEERE, FELLOWS, and WIEST, JJ., concurred.