20 P.(2d) 1030

**STATE v. THOMPSON.**

No. 3697.

Supreme Court of New Mexico.

Feb. 27, 1933.

Rehearing Denied April 19, 1933.

Joseph Gill and Mann & Wilson, all of Albuquerque, for appellant.

E. K. Neumann, Atty. Gen., and Quincy D. Adams, Asst. Atty. Gen., for the State.

SADLER, Justice.

The defendant, appellant in this court, seeks through appeal the reversal of a judgment of conviction rendered against him by the district court of Valencia county. He was tried on change of venue from Socorro county. The jury found him guilty of the offense charged, to wit, issuance of a fraudulent check, and he was sentenced to a term of years in the state penitentiary.

Since the decision, as we view the matter, turns upon the correctness of the trial court's denial of defendant's motion for a directed verdict, interposed at close of state's case in chief, upon which ruling the defendant stood and declined to put on evidence, we shall proceed at once to a consideration of this claim of error.

The defendant for some years prior to the date of the offense charged had been engaged on a large scale in the business of cattle buying in Socorro and adjoining counties. On November 12, 1928, pursuant to contract, he received 78 head of cattle at Magdalena in Socorro county from one R. L. Cox, and delivered to him in settlement of purchase a check drawn by defendant to seller's order on First National Bank of Hot Springs, N. M., in the sum of $4,266.87. The check thereafter on November 14th or 15th was duly presented to the drawee bank as

a collection item through First National Bank of Albuquerque, and dishonored. It was again presented through First State Bank of Magdalena on November 22, 1928, along with a list of other checks drawn by defendant on the same bank totaling $49,340.19, with request to hold until funds were available, if immediate payment could not be made, and to pay individually and as soon as possible, if balance were insufficient to cover entire amount. Again was payment refused, at least, not made, and the check stood dishonored at time of trial.

We shall assume that the facts hereinabove related made out before the jury the prima facie case contemplated by section 1, c. 132, Laws 1919. The serious question is whether the testimony of the state's witnesses and record evidence introduced in connection therewith do not entirely overcome the prima facie case resulting under the statute from the mere drawing of the check and its dishonor. From a careful consideration of the evidence, we are convinced that the prima facie case is thus overcome.

After defining the offense, section 1 of chapter 132, Laws of 1919, provides: "In the prosecution under this section as against the maker or drawer thereof, the making, drawing, uttering or delivering of a check, draft or order, payment of which is refused by the drawee because of lack of funds *or credit*, shall be prima facie evidence of *intent to defraud* and of knowledge of insufficient funds in *or credit* with such bank or other depositary," etc. (Italics ours.)

Section 1 of chapter 132, Laws of 1919, is amended by chapter 126, Laws of 1929 (sections 35-1910 and 35-1911, Comp. St. 1929), but in no respect material to this prosecution, and the above-quoted portion, being re-enacted in the same language as originally adopted, is deemed merely a continuation thereof. 26 Am. and Eng. Enc. of Law, 735; 1 Lewis' Sutherland Statutory Construction (2d Ed.) § 238; 36 Cyc. 1083; Cortesy v. Territory, 7 N. M. 89, 32 P. 504. The offense charged having been committed, if at all, before the amendment, and the material provision thereof remaining the same, no question is presented as to which should control.

Turning again to the facts, they disclose that some two weeks before the check in question was drawn defendant had an interview at Socorro with Sam N. Matson, cashier of drawee bank, and a Mr. McFee, of McFee Commission Company, to which company defendant had been shipping cattle. At this interview the cashier solicited defendant's entire business for his bank. Theretofore the defendant had been having large transactions with the First National Bank of Santa Fe and had expressed some doubt whether the Hot Springs bank was large enough to take care of his business, but was reassured. The net result of this three-man parley was that McFee agreed for the commission company to honor defendant's drafts on it for cattle shipped, and cashier Matson for the Hot Springs bank agreed to honor defendant's checks for cattle purchased. Cashier Matson testified that he agreed to honor the checks because Mc-

Fee agreed to honor the drafts. Apparently at this same meeting Matson learned of an arrangement defendant had for a loan, and was thus also influenced in making the arrangement outlined. Defendant in turn agreed to deposit with Matson all his receipts, and there is nothing in the record to show that defendant failed in any particular to fulfill his part of the arrangement.

Remembering that defendant was convicted of issuing a fraudulent check for $4,266.-87, it is significant to note that, according to the state's own evidence, the bank's ledger sheets showed a balance to his credit of $5,-029.92 at the close of business on November 13, 1930, the very earliest day on which the check could have been presented; that on the following day he had a balance of $26,-578.06; on the day after that a balance of $14,493.15; and on November 22d, the day of the check's second presentment, a balance of $6,314.65. The check was first presented and returned unpaid on November 14th or 15th.

Furthermore, on November 15th the bank through mistake paid a check of the defendant in the sum of $11,481 upon which payment had been stopped. Except for this error of the bank, which was corrected on November 30th by restoring to his credit the amount of the erroneously paid check, the defendant's balance on November 15th would have been $25,976.15; and on November 22d, $17,795.65.

Standing alone, the foregoing facts would be decisive of the case. But the state seeks to overcome their effect by a showing that these book balances were fictitious and unreal. The substance of its showing in this direction consists of evidence that, during the very period and on the very days when these cash balances appeared on the bank's ledger sheets, defendant had credit on the bank's books for $40,000 of drafts on the First National Bank of Santa Fe, which had been dishonored, but not charged back to his account; also, evidence that it held for collection a considerable number of other checks issued on the same or at an earlier date than the one in question. The practice of the bank with respect to these additional checks as outlined by its cashier was that, if defendant's balance were insufficient to pay all as presented on a given day, it would hold and pay in the order of their presentment, as funds became available. In fact, most if not all of the checks thus held were received under specific instructions so to handle. The total of these claims against the account, inclusive of the drafts and checks, at the time of first presentment of check, was some $85,000.

Passing, without considering, question of the bank's right under reason assigned to carry credit balances from day to day, at the same time refusing payment of particular checks within the amount of such balances, if given full force, the only effect of this evidence would be to show defendant's account lacked sufficient funds to meet the check in question, not that he lacked sufficient credit with the bank to absorb same. In order to warrant a conviction under the

statute, the state must show both. It is in the latter respect that the state's case fails.

■ Between October 3 and 19, 1928, defendant drew a series of drafts on First National Bank of Santa Fe totaling $80,000, which were placed to defendant's credit in Hot Springs bank and paid by drawee bank. Between October 22d and 29th, defendant drew three drafts on the Santa Fe bank totaling $40,000, which were placed to his credit in the Hot Springs bank and later dishonored. The reason for their dishonor does not appear in the record. The first to be charged back to defendant's account was one for $10,000 on November 16th; then one for $15,000 on November 19th; and the last for $15,000 on November 30th. Thus at the very moment of the first presentment of this check the bank by its own records was extending to defendant credit on unpaid drafts to the extent of $40,000.

The cashier of the Hot Springs bank, as a state's witness, in answer to a specific question admitted that defendant on the day this check was presented had credit with the bank in excess of the amount thereof. And while asserting that he never at any time had any arrangement with him to pay any check "that he didn't have the money there for," this same witness gave the following testimony, to wit:

"Q. And isn't it true, Mr. Matson, that because of what Mr. McFee of the McFee Commission Company had told you about honoring these drafts that you at that time agreed with Mr. Thompson to honor his drafts for the purchase of cattle? A. Yes, sir.

"Q. And under that arrangement with Mr. Thompson made about the last of October, 1928, you agreed to honor the checks and drafts given by Mr. Thompson for the purchase of cattle? A. With the provision that he keep the account there and send in the drafts that he received for cattle through our bank providing he would do all of his business through the bank so that I could keep a check on him and know what he was buying and what he was selling.

"Q. As a matter of fact, then, Mr. Matson, there was an arrangement made between you, as Cashier of the First National Bank of Hot Springs on behalf of said bank, and Mr. Thompson or understanding between you that he should have credit at the First National Bank of Hot Springs if he did all his business through your bank and that you would honor his drafts or checks, if given by him for cattle? A. Providing—Yes, I gave him permission, told him we would take care of his checks."

Questioned as to whether it was not a fact that, under the arrangement between the defendant and his bank throughout the entire period that he was doing business with it, defendant would deposit with the bank for collection drafts drawn on the various commission houses, and that the bank would then honor checks drawn by defendant in payment for cattle, and thus at times pay overdrafts, which overdrafts would be wiped out by the collection of the drafts, the witness replied: "A. It is partly the way but it wasn't the understanding at first."

Pressed further as to whether this was not the arrangement and the practice, the witness answered unequivocally, "Yes."

Notwithstanding the bank's arrangement through its cashier to honor defendant's checks for cattle purchased against drafts on commission houses for cattle shipped, the cashier stated that, after notice of dishonor of aforesaid drafts on the Santa Fe bank, he did not thereafter credit defendant with the proceeds of drafts deposited until notice of collection was reported; a change in policy not uniformly adhered to as hereinafter noted with reference to some of the drafts on McFee Commission Company. When asked if he informed defendant of this change in policy, he answered: "I don't remember."

This is significant, in that the cashier admitted that all checks dishonored, including the one in question, were drawn within a period of about seven days of the date on which the check in question was·given. Beginning November 14th, and within a space of four or five days, defendant deposited with the Hot Springs bank five drafts on McFee Commission Company for $20,000 each, totaling $100,000. At least one of them was placed to his credit in the bank on November 14th, and notice of its dishonor had not been received when the check in question was presented. Still another was drawn and delivered to the bank on November 15th, and under the arrangement admitted by the bank's cashier, of honoring checks against uncollected drafts, defendant would have been fully warranted in relying at time of issuing the check upon this extension of cred-

it. All of these drafts were subsequently dishonored, though on December 4th following, $48,000 ·on account was transmitted to the Hot Springs bank for defendant's credit by McFee Commission Company and absorbed in meeting checks held by the bank for collection. It is impossible on the record to apply this $48,000 credit from McFee Commission Company to other than the cattle shipments covered by the foregoing drafts. In fact, at one point in his testimony the cashier admits the credit does flow from such transaction, though later professing ignorance on the subject.

Now where does this line of inquiry lead us? The state asserts the ledger balances though ample in amount may not be relied upon by defendant as showing *funds* sufficient to meet this check because fictitious. But what as to *credit*? It is just as essential under the statute to show an absence of credit as a want of funds. The state may with some reason, in view of the facts shown, insist that the ledger balances were unreal as reflecting moneys deposited. It is futile for it to urge that balances disclosed by the bank's own records do not represent credit extended. If they do not represent the latter, what do they represent and why were they there? Indeed, the question naturally occurs why defendant's book balances were not applied in reduction of the numerous checks claimed to be held for collection. The answer, of course, is that it was looking out for its $40,000 of unpaid drafts, though not yet ready to charge them back, and thus withdraw the credit.

An examination of the ledger sheets of defendant's account with the Hot Springs bank over the period from September 10, 1925, down to the dates material to this inquiry show innumerable overdrafts, some of them running into thousands of dollars. The telltale symbol "OD" occurs with frequent regularity opposite the statement of defendant's daily balances. For instance, State's Exhibit 17–A discloses the following on daily balances beginning November 1, 1928, to and including November 15th thereafter, on which last-mentioned day, or the day before, the check made the basis of this prosecution was presented, to wit:

| 1928 | Balance | |
|---|---|---|
| Nov. 1 | $ 4,902.70 | |
| 2 | 4,212.70 | |
| 3 | 4,699.20 | |
| 5 | 13,149.65 | OD |
| 7 | 40,087.34 | |
| 8 | 19,158.82 | OD |
| 9 | 2,518.27 | OD |
| 10 | 5,982.77 | OD |
| 13 | 5,029.92 | |
| 14 | 26,578.06 | |
| 15 | 14,495.15 | |

On all of the dates shown above the bank was extending credit to defendant on its $40,000 of unpaid drafts on the Santa Fe bank, notwithstanding which it permitted him to overdraw to the extent of $13,149.65 on November 5th, and $19,158.82 on November 8th. It seems strange that he should be convicted of fraudulently asserting credit with a bank to the extent of $4,266.87 on No-

vember 12th which had extended same to him in an amount almost five times that sum on November 8th.

All of this evidence appears from the state's case in chief. The defendant moved for a directed verdict, and stood upon the court's ruling denying same. Under all the circumstances we cannot escape the conclusion that it overcame the prima facie case resulting under the statute. It follows that the judgment of the trial court must be reversed, and the cause remanded, with directions to the lower court to discharge the defendant.

It is so ordered.

WATSON, C. J., and BICKLEY, J., concur.

ZINN, J., did not participate.

HUDSPETH, Justice (dissenting).

I have found no other fraudulent check case in which the discharge of the defendant was placed upon the ground that he had deposited bogus drafts in the payee bank, or that the payee bank was obligated to pay and carry as overdrafts his checks after it discovered that the defendant had palmed off on it and obtained credit upon bogus drafts in a total sum amounting to 160 per cent. of the capital stock of the bank. The capital stock of the payee bank, the First National Bank of Hot Springs, was $25,000.

It is not claimed that any special arrangement had been made for the payment by the payee bank of the Cox check, upon which

this prosecution is based. When it was presented for payment, other checks which had been accumulating for nearly a month were on file for collection amounting to more than double the capital stock of the bank. The record discloses that numerous other complaints against the defendant were filed by cattlemen. Nine other checks were sent to the payee bank by the First State Bank of Magdalena with the Cox check, and all were returned unpaid January 8th. If the defendant should be brought to trial upon nine informations, based upon the nine other checks, under the decision in this case the state would necessarily fail to make out a prima facie case; the same bank books and the same evidence of "credit" being equally relevant in all cases. And the records of the ten cases would show that the defendant was free, because we held in substance that a $25,000 bank, after it discovered that $40,000 in drafts on which it had extended defendant credit were bogus, was obligated to pay and carry as overdrafts the ten checks aggregating the sum of $49,340.12, the United States banking laws and regulations notwithstanding.

All these checks should be considered in this case in determining the intent, plan, or system of the defendant. State v. Bassett, 26 N. M. 476, 194 P. 867, 869. The rule is stated in 16 C. J. 591: "Where the crime charged is part of a plan or system of criminal action, evidence of other crimes near to it in time and of similar character is relevant and admissible to show the knowledge and intent of the accused and that the act charged was not the result of accident or inadvertence. This rule is often applied where the crime charged is one of a series of swindles or other crimes involving a fraudulent intent for the purpose of showing this intent."

It seems to me that the opinion of the court gives too much weight to the failure of the bank to promptly charge the defendant's account with the $40,000 upon receipt of notices of dishonor of the three drafts. It is putting form above substance. If accounting is exalted a few notches higher, we will discharge a highwayman who takes $40,000 at the point of a pistol because his victim had not made a debit entry of the item against the robber on his books.

Defendant's letters alone furnish substantial evidence that he was kiting drafts (Preston v. Grand Rapids Savings Bank, 232 Mich. 194, 205 N. W. 49), and that he had no arrangement with the McFee Commission Company for a loan, or that a draft would be paid until sales of his cattle produced sufficient funds to meet it. On November 19th he wrote the cashier of the payee bank: "Sent you another draft this A. M. You can send them both in when you just have too will have the money there to meet them if no more delays."

After the receipt of the McFee remittance of $48,000, the defendant designated certain checks to be paid which practically exhausted the account. The cashier of the payee bank testified as follows:

"Q. Can you state whether there was at any time from November 13th on to the 8th

of January, when it was not, or there was not on your desk or calendar for payment checks having precedence over the Cox check and sufficient in amount to wipe out any balance that Mr. Thompson had there in his account?

"Mr. Mann: I object to this question on the same ground, identical grounds that were objected to previously.

"The Court: Overruled.

"Mr. Mann: Exception.

"A. There was enough checks there ahead of the Cox check to wipe out his account until December 4th.

"Q. And then what about December 4th? A. When this credit of $48,657.64, when that credit was given Mr. Thompson all of the checks in our files or for collection at that time were paid at Mr. Thompson's designation. Mr. Thompson was called in and designated the checks to be paid out of that credit.

"Q. Was there sufficient amount in his balance there to his credit at that time to pay all the checks that were there at your bank for collection against that account?

"Mr. Mann: I object to this on the same grounds as to previous line of similar questions. .

"The Court: Overruled.

"Mr. Mann: Exception.

"Q. That is on December 4th? A. No.

"Q. Did Mr. Thompson come there to the bank on that date? A. Yes sir.

"Q. And just what did he do with reference to designating the checks to be paid? A. I took Mr. Thompson in the back room and showed him all the checks and told him to see which ones he wanted paid.

"Q. And you paid them according to his designation? A. Yes sir.

"Q. That left a balance in his account of something over—What is it? A. Left $91.97."

The cashier of the payee bank testified that for years he had assisted the defendant in a clerical capacity at certain seasons. About the middle of October he told the defendant that he would not be able to help him any more; and the cashier testified further: "A. I carried on that date, I carried back these drafts around $30,000 that he had collected at Magdalena and at that time Mr. Thompson was issuing more checks than he was receiving for the cattle. On this same date at Magdalena he cut out something like one hundred head of cows and sent them down to Socorro to a pasture that he didn't get any money for and he shipped several cars of cattle to Saint Joe, Missouri, that he didn't know what they were going to bring and it looked to me that my place was at Hot Springs in the bank."

The defendant had notice almost daily during the month of November of the accumulation of his unpaid checks in the payee bank. The cashier testified as follows: "A. During my telephone conversation and personal conversation with Mr. Thompson I urged him to take care of his account and

get funds that would be immediately available and to get his account in good shape so that we could take care of him as we did the previous year. These conversations took place nearly every day or night. Mr. Thompson could get me or I could get Mr. Thompson every night with a few exceptions and Mr. Thompson was advised of the condition of his account at each one of these telephone conversations. He was advised how much he was overdrawn and approximately the amount of the checks that were in the bank for payment and the condition of these drafts that were out for collection, that had been refused payment and particularly on these Santa Fe drafts, the first one, he told me that he had the money there and to return the draft to the Santa Fe bank and it would be paid. These drafts were returned from two to three times to the bank and finally payment was refused entirely."

The statute defines "credit" as follows: "Sec. 2. The word 'credit' as used herein, shall be construed to mean an arrangement or understanding with the bank or depositary for the payment of such check, draft or order." (Laws 1919, c. 132.)

I can find no evidence in the record which tends to prove that at the time of the issuance of the Cox check the defendant had any arrangement or understanding with the bank for the payment of the check; the bank having discontinued paying his overdrafts, as it had a right to do. Michie on Banks and Banking (2nd Ed.) vol. 5, p. 577, says: "It has been said that the practice of paying overdrafts is based on no authority in sound usage or in law, and should be abolished. And, of course, a bank may refuse to pay an overdraft. Because a bank often lets good customers overdraw, the latter do not thereby acquire the right to do so when the bank deems it improper to permit it. And such a custom may be discontinued at any time at the bank's option, in the absence of any reliance thereon by a third person." (Citing First Nat. Bank v. First Nat. Bank. 127 Tenn. 205, 154 S. W. 965.)

On the contrary, the evidence that the payee bank had refused to pay checks of the same class as the check on which this prosecution is based, in a total amount of more than ten times the face value of the Cox check, and that these checks were on file for collection with the payee bank at the time of the issuance of the Cox check, negatives the proposition that the defendant had "credit" with the payee bank, or reasonable grounds to believe that the check would be paid. Rex v. Parker, 7 Car. & P. 825, 2 Moody, C. C. 1; note, 35 A. L. R. 375; Wharton's Criminal Law (12th Ed.) § 1427. I therefore dissent.